UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

D. SCOTT CARRUTHERS, SPRINGHAWK, LLC,
and SUMMERHAWK, LLC,

        Plaintiffs,

     -against-                        03 Civ. 7768 (CM)

DAVID FLAUM, FLAUM MANAGEMENT
COMPANY, INC., 3D ASSOCIATES, LLC,
ABC PACIFIC REALTY, LLC, A.P.
EQUITY, INC., ANCESTRAL RECLAMATION,
LLC, ALAN H. YOUNG, individually, d/b/a
LINDENBAUM AND YOUNG, LINDENBAUM
AND YOUNG, CHARLES PETRI, GENE
BARBANTI, individually and d/b/a THE BARBANTI
GROUP REAL ESTATE, JAMES F. SIMERMEYER,
HARRY B. WALLACE AND SIMERMEYER &
WALLACE,

        Defendants.
-----------------------------------------------------------------x

### MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT ABC PACIFIC'S MOTION TO DISMISS AND GRANTING IN PART AND DENYING IN PART SIMERMEYER DEFENDANTS' MOTION TO DISMISS AND DENYING SIMERMEYER DEFENDANTS' MOTION FOR RULE 11 SANCTIONS

McMahon, J.:

      In this action, plaintiffs D. Scott Carruthers ("Carruthers"), Springhawk, LLC

("Springhawk") and Summerhawk, LLC ("Summerhawk") seek to recover damages and for

equitable relief against various attorneys, individuals, and entities for their roles in (I) allegedly

fraudulently inducing Plaintiffs to provide $550,000 in funds for the purchase of real property,

and to incur other out-of-pocket expenses, in connection with certain business ventures in

Sullivan and Suffolk Counties, and (ii) allegedly misappropriating, diverting and/or converting

those funds to other, undisclosed uses in breach of various contractual, common law and/or

fiduciary obligations to plaintiffs. This action also seeks to recover from the current owners of the real property, whom plaintiffs allege have been unjustly enriched as a result of the above.

Two motions are before the court. The first is by defendant ABC Pacific Realty, LLC ("ABC Pacific"), the current owner of the property, to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative, for summary judgment pursuant to Rule 56. The only claim asserted against ABC Pacific, Count XI, is for unjust enrichment. It is dismissed.

The second motion is by defendants James F. Simermeyer ("Simermeyer"), Harry B. Wallace ("Wallace"), and Simermeyer & Wallace (collectively, "the Simermeyer defendants") to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(2), (4), (5), and (6) (Counts I-IV).[1]

Counts I & II allege legal malpractice and conflict of interest by Simermeyer, with Wallace and Simermeyer & Wallace jointly liable for Simermeyer's purported defalcation. In Counts III and IV, Simermeyer is charged with self-dealing and breach of the duties of loyalty and fiduciary duty. The motion is granted as to Count III, and granted in part and denied in part as to Counts I, II, and IV.

The Simermeyer defendants also ask that Rule 11 sanctions be imposed against plaintiffs' counsel. Because their motion is procedurally defective, their request is denied.

**Facts**

---

[1] Defendants also argue that the Complaint should be dismissed for lack of personal jurisdiction under Rule 12(b)(2), and for insufficiency of form and service of process under Rule 12(b)(4) & (5).

According to the Amended Complaint,[2] in late 2001, Carruthers was approached by Simermeyer and solicited to participate in a business venture with the Unkechaug Indian Nation to develop real estate and casino gaming facilities on ancestral land of the Unkechaug in Sullivan and Suffolk Counties in the State of New York (the "joint venture"). Amended Complaint, filed May 11, 2005 ("Cplt.") ¶ 19. Simermeyer introduced Carruthers to members of the Unkechaug Indian Nation ("the Unkechaugs"), including its Chief, Harry Wallace, who also solicited Carruthers' involvement in the joint venture with the Unkechaugs. Cplt. ¶ 20.

The Unkechaugs desired to develop real property and open gaming facilities at one or more sites in Sullivan County and sought land of suitable geographic location and ancestral connection for that purpose. Cplt. ¶ 29. Based on representations by Simermeyer and Wallace, Carruthers decided to participate in the joint venture with the Unkechaugs. Cplt. ¶ 21.

Both Wallace and Simermeyer are attorneys licensed to practice law in New York State and practice as a partnership called Simermeyer & Wallace (which is also a defendant in this case). Cplt. ¶ 16-18. Carruthers retained Simermeyer to represent him personally and also to form and represent the two Plaintiff LLCs, Springhawk and Summerhawk. Cplt. ¶ 22.

Springhawk and Summerhawk were both established in January 2002, and, at inception, were both made up of Carruthers, Simermeyer and Mitchell Stanley ("Stanley"). Cplt. ¶¶ 23, 25. Carruthers was to be the controlling member of both Springhawk and Summerhawk with a 56.25% ownership interest. Cplt. ¶¶ 24, 26. Simermeyer and Stanley were to be minority

---

[2] On a motion to dismiss, the court must accept as true all of the well-pleaded factual allegations contained in the complaint. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (citing Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)).

owners in both LLCs, with 25% and 19.25% membership interests, respectively. Cplt. ¶¶ 24, 26.[3]

Springhawk and Summerhawk are Delaware limited liability companies. <u>See</u> Complaint filed in the State Court Action, on August 12, 2003 ("State Action Cplt."), ¶ 13.[4]  They were established for the purpose of developing and operating high stakes Bingo, other gaming activities, gasoline sales, and tobacco sales in Sullivan County and Long Island, New York, on ancestral land of the Unkechaug Indian Nation. <u>Id.</u>  Upon the formation of Springhawk and Summerhawk, the members entered into operating agreements and became contractually bound to each other pursuant to those agreements (the "operating agreements"). <u>Id.</u> at 16-17;Cplt. ¶ 112.[5]

Simermeyer allegedly served as attorney for Carruthers, Springhawk, and Summerhawk in connection with certain business matters relating to Springhawk and Summerhawk. Cplt. ¶ 27. Throughout the course of his representation of Carruthers, Springhawk, and Summerhawk, Simermeyer was paid some $75,000 in fees in connection with the joint venture, including but

---

[3] The court takes notice that the combined percentages as listed in the Amended Complaint do not equal 100%, but rather 100.50%.

[4] A court "may take judicial notice of admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action." <u>Harris v. New York State Dept. of Health</u>, 202 F. Supp. 2d 143, 173 n. 13 (S.D.N.Y. 2002).  Plaintiffs omit this allegation from the Amended Complaint, but it remains a pleaded assertion in Complaint filed against Simermeyer and Wallace in the Supreme Court of the State of New York, Suffolk County, Index No. 20147/03 ("the State Court Action"). This allegation  is essential to (1) understanding why Carruthers, Springhawk, and Summerhawk became involved in these land deals; and (2) to illuminate the business purpose of Springhawk and Summerhawk.

[5] In <u>Carruthers v. Flaum</u>, 365 F. Supp. 2d 448, 464-70 (S.D.N.Y. 2005) ("<u>Carruthers I</u>"), I found the operating agreement pursuant to which Springhawk was formed to be invalid because its stated corporate purpose was illegal. <u>See id.</u> at 464-70.  I did not make any findings regarding the validity of the Summerhawk agreements. <u>See id.</u> at 469-70.

not limited to the failed real property estate deals that are the subject of this lawsuit. Cplt. ¶ 28.

Springhawk and Summerhawk entered into various agreements with the Unkechaug Indian Nation. Cplt. ¶ 22.  The agreements granted Springhawk the exclusive right to operate and manage gaming facilities and other economic development projects opened by the Unkechaug Indian Nation in Sullivan County, and granted Summerhawk the same rights in Nassau and Suffolk Counties.  State Action Cplt. ¶¶ 18, 19.[6]

In the spring of 2002, Simermeyer and/or Wallace introduced Carruthers to defendants Petri, Young, and Barbanti. Cplt. ¶ 30.  Petri, Young, and Barbanti sought to convince Carruthers and the Unkechaug Indian Nation that they could identify the necessary land and assist in the financing for the joint venture. Cplt. ¶ 30.  Simermeyer took no steps to verify any of the information or assurances given by Petri, Young, and Barbanti, but represented to Carruthers that these individuals were reliable and credible. Cplt.  ¶ 31.

After the initial introduction of Petri, Young, and Barbanti to Carruthers, Simermeyer and Wallace exerted pressure upon Carruthers and Springhawk to enter into a variety of contracts and agreements with Young and Petri for the acquisition and development of real estate in Sullivan County.  Cplt.  ¶ 32.

*Simermeyer's Alleged Malpractice and the Failed Sullivan County Real Estate Deals*

The specific parcels of real estate that were discussed in various meetings between Simermeyer, Wallace, Petri, Young, Carruthers and others included the Apollo Mall Plaza, located in the Town of Thompson, New York, and the 3D Industrial Park, also situated in the Town of Thompson.  Cplt.  ¶ 34. The Unkechaug Indian Nation ultimately decided to acquire the

---

[6] See note 4. In Carruthers I, I found the agreements between the Springhawk and the Unkechaug invalid because of their stated illegal purpose. 365 F. Supp. 2d at 464-69.

Apollo Mall Plaza and 3D Industrial Park after determining that it held ancestral land claims to both properties. Cplt. ¶ 35.

Simermeyer led Carruthers to believe that the proposed real estate acquisitions would proceed smoothly and that clear title to the properties would be obtained. Cplt. ¶ 36. Carruthers had previously been given assurances by Petri, Young, and Barbanti that the two properties were owned and/or controlled by Ancestral, and/or its principals. Cplt. ¶ 37. Petri told Carruthers that he and his wife owned the 3D Industrial Park, as well as a number of other properties. Id. Carruthers allegedly relied on all of these representations. Id.

Carruthers allegedly assumed that Simermeyer, in his capacity as attorney for Carruthers and Springhawk, would verify all necessary legal aspects of the transaction, as well as the bona fides of Petri, Young and Barbanti. Cplt. ¶ 38. Carruthers alleges that Simermeyer repeatedly failed to do so. Id.

In negotiating the land deals on behalf of Ancestral, Petri, Young and Barbanti represented to all parties to the deal that the Apollo Mall Plaza was encumbered by approximately $500,000 in tax and other government liens, as well as a mortgage in favor of the Bank of Kuwait in the amount of approximately $3,500,000. Cplt. ¶ 39. Simermeyer, though acting as attorney for Springhawk and Carruthers, took no steps to verify the existence or amounts of these or other encumbrances on the Apollo Mall property. Cplt. ¶ 40. Petri, Young and Barbanti further falsely represented that the Bank of Kuwait mortgage would be settled for approximately $1,500,000. Cplt. ¶ 41. Simermeyer likewise took no steps to verify this claim. Cplt. ¶ 42.

In reliance upon various assurances made by Simermeyer, Wallace, Petri, Young and Barbanti, one or more written memoranda of agreement was signed by the Unkechaug Indian

Nation (as purchaser), Springhawk (as co-developer of the two properties) and Ancestral Reclamation (as seller). Cplt. ¶ 43.  Pursuant to these agreements, Ancestral was to transfer both the Apollo Mall Plaza and the 3D Industrial Park to the Unkechaug Indian Nation. Cplt. ¶ 44.

*The $550,000 Cash Advance*

To get the deal done, however, Ancestral, through Petri, Young and Barbanti, insisted on a $550,000 purchase deposit. Cplt. ¶ 45.  Although not legally required to do so under the agreements with the Unkechaug Indian Nation, Carruthers and Springhawk, relying on the assurances and perceived good faith of Simermeyer, Wallace, Petri, Young and Barbanti, agreed to advance the initial deposit of $550,000 to acquire the two parcels on the Unkechaug Indian Nation's behalf. Cplt. ¶ 46.

This payment of $550,000 was on top of more than $1,000,000 previously advanced by Springhawk and Carruthers for various other project development costs. Cplt. ¶ 47. Because of the considerable advances already made, Carruthers was reluctant to advance the $550,000 purchase deposit. Cplt. ¶ 48.  However, under considerable pressure from his attorney and business partner, Simermeyer, as well as Wallace, Carruthers ultimately agreed to do so. Cplt. ¶ 49.

In making the decision to advance funds, Carruthers and Springhawk allegedly relied upon the legal advice of Simermeyer, who had an ongoing attorney/client relationship with Springhawk and Carruthers. Cplt. ¶ 50.  At Simermeyer's direction, Carruthers forwarded the $550,000 to Simermeyer, as attorney for Carruthers and Springhawk. Cplt. ¶ 51. These funds were advanced by Carruthers in a trust capacity. Id.

In turn, Simermeyer delivered all of the funds advanced by Carruthers directly to Young, without any instructions as to the manner in which they were to be released or used in

connection with the real estate deal. Cplt. ¶ 52. Young, himself a licensed New York attorney, represented that he would hold the $550,000 in escrow pending a formal court settlement of the Bank of Kuwait mortgage. Cplt. ¶ 53.

Simermeyer released to Young the $550,000 he held in trust for Carruthers and Springhawk. Cplt. ¶ 58. Young received the $550,000 advanced from Simermeyer during the first week of May 2002. Cplt. ¶ 162.

*Alleged Misrepresentations*

Carruthers alleges that various representations made by Petri, Young and Barbanti regarding the ownership of and liens against the Apollo Mall Plaza and 3D Industrial Park were almost all untrue. Cplt. ¶ 54.

Carruthers alleges that "the most basic due diligence" by Simermeyer would have uncovered the following three facts (Cplt. ¶ 55):

1.  The ownership of the Apollo Mall Plaza property was <u>not</u> held by Ancestral, as Petri, Young, Barbanti had maintained, but rather by the Sullivan County Industrial Development Agency ("IDA") (<u>id.</u>);

2.  The ownership of the Apollo Mall Plaza ground lease was <u>not</u> held by Ancestral, as Petri, Young, Barbanti had maintained, but rather by a company known as A.P. Equity, which had recently been dismissed from a Chapter 11 bankruptcy proceeding (<u>id.</u>); and

3.  The mortgage against both the property and the ground lease was <u>not</u> owned by the Bank of Kuwait, but rather by a company known as ABC Pacific Realty, LLC, which had taken an assignment of the mortgage in May 2001 (<u>id.</u>).

Simermeyer allegedly failed to do the necessary due diligence with respect to discovering

these facts as the attorney for Springhawk and Carruthers. Cplt. ¶ 56.  Other than assisting in the drafting of the initial "purchase contract" for the Sullivan County properties, Simermeyer took none of the "customary and reasonable legal steps" to competently represent Carruthers and Springhawk in closing the real estate transaction. Cplt. ¶ 57.

*Title Transfer of the Apollo Mall Plaza*

Despite the fact that it did not at the time own the property, A.P. Equity – through its president, Barbanti, whose signature was notarized by Young – executed and delivered a deed for the Apollo Mall Plaza to the Unkechaug Indian Nation on April 26, 2002. Cplt. ¶ 60.

On or about May 3, 2002, A.P. Equity used all or substantially all of the funds advanced by Carruthers and Springhawk to purchase the Apollo Mall Plaza property from the Sullivan County IDA. Cplt. ¶ 61.

Approximately $300,000 of the $550,000 advanced by Carruthers and Springhawk was received by the Sullivan County IDA from A.P. Equity and/or Ancestral and was applied to outstanding real estate taxes or other similar obligations (collectively, the "tax liens") then outstanding against the Apollo Mall property.  Id. at ¶ 171.  The tax liens constituted a first lien against the Apollo Mall property entitled to priority ahead of the mortgage held by ABC Pacific. Id. at ¶ 172.  Carruthers and Springhawk believed that the payment would be applied to the tax liens, but that Springhawk would obtain the benefit of such payment by obtaining a release of the tax lien when the property was transferred to the Unkechaug Indian Nation. Id. at ¶ 174.

Ultimately, title to the Apollo Mall Plaza was transferred to the Unkechaug Indian Nation, but none of the promised steps to settle the mortgage owned by ABC Realty was ever taken.  Cplt. ¶ 62

*Foreclosure on the Apollo Mall Plaza*

The mortgage claim of ABC Pacific remained a lien against the Apollo Mall Plaza notwithstanding the transfer of title to the Unkechaug Indian Nation. Cplt. ¶ 63. And, unbeknownst to Carruthers, Springhawk or the Nation, by that time, the mortgage was in the late stages of foreclosure. Id.

Because Petri, Young and Barbanti failed to resolve the mortgage claim on the Apollo Mall Plaza – as they had promised to do – the foreclosure action was ultimately concluded. Cplt. ¶ 64. The property was purchased by the mortgage holder – ABC Pacific – at the foreclosure auction and the Unkechaug Indian Nation was left with nothing. Id.

ABC Pacific now holds unencumbered title to the Apollo Mall property. Cplt. ¶ 176.

*3D Industrial Park*

A portion of the funds advanced by Carruthers and Springhawk was used to purchase the 3D Industrial Park, however, the 3D Industrial Park was never transferred to the Unkechaug Indian Nation. Cpl. ¶ 65. Instead, the 3D Industrial Park is now owned by 3D Associates and/or Barbanti or companies owned or controlled by him. Id.

*Simermeyer's Alleged Conflict of Interest*

"At all times relevant to this action, Carruthers was under the reasonable belief that Simermeyer was serving as his personal attorney, as well as attorney for Springhawk." Cplt. ¶ 66. Accordingly, Carruthers expected Simermeyer to use reasonable care and diligence to ensure that funds advanced by Carruthers and Springhawk would be safeguarded. Id.

Additionally, at all relevant times, Carruthers reasonably believed that any dealings between Simermeyer, on the one hand, and Petri, Young, Barbanti, Ancestral, etc., on the other, were conducted by Simermeyer with the best interests of Carruthers, Springhawk, and Summerhawk kept paramount. Cplt. ¶ 67.

However, at the same time Simermeyer was representing Carruthers, Springhawk, and Summerhawk, Simermeyer was allegedly also representing the differing interests of the Unkechaug Indian Nation. Cplt. ¶ 68. Simermeyer did not disclose to Carruthers any conflicts of interest created by Simermeyer's simultaneous representation of Carruthers, Springhawk, and Summerhawk, as well as by Simermeyer's ownership interest in Springhawk and his representation of the Unkechaug Indian Nation. Cplt. ¶¶ 69, 70. Nor did Simermeyer obtain any consent to this simultaneous representation of Carruthers and the Plaintiff LLCs on the one hand, and the Unkechaug on the other. Cplt.¶ 70.

Carruthers subsequently learned that, beginning at some point in March or April of 2002, Simermeyer had secretly been conspiring with at least Wallace, Petri, and Young to oust Carruthers as a member of Springhawk and Summerhawk and to divide Carruthers' ownership interest in the two LLC's among themselves. Cplt. ¶ 72

Carruthers also has come to learn that the request made by Simermeyer, among others, for Carruthers and Springhawk to advance the $550,000 real estate purchase deposit was made after the time Simermeyer had decided to collaborate with Wallace, Petri, and Young to oust Carruthers from Springhawk and Summerhawk. Cplt. ¶ 73.

In an effort to circumvent the contractual rights of Carruthers in Springhawk and Summerhawk, Simermeyer established a new corporation known as Eagle's Hill, Inc. Cplt. ¶ 74. Plaintiffs' believe that Wallace is an undisclosed partner/investor in Eagle's Hill. Id. And Plaintiffs allege that Simermeyer formed this new company with the intention of entering into new contracts with the Unkechaug Indian Nation. Cplt. ¶ 75.

**Prior History**

The initial Summons and Complaint was filed in this action on August 27, 2003 in the

Supreme Court of the State of New York in Sullivan County. There being complete diversity, the action was removed by defendants on October 2, 2003, pursuant to 28 U.S.C. § 1332(a). By Decision and Order dated March 31, 2005, I dismissed most of the claims asserted in plaintiffs' initial Complaint. See Carruthers v. Flaum, 365 F. Supp. 2d 448 (S.D.N.Y. 2005).

On May 6, 2005, plaintiffs filed a motion to amend the Complaint to remove those dismissed claims, to add new parties to this action, and to assert additional claims in this action. I granted plaintiffs' request on May 10, 2005, and on May 11, 2005, plaintiffs filed their Amended Complaint.

**Standards**

A court may grant a Rule 12(b)(6) motion to dismiss for failure to state a claim only "when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Phillip v. University of Rochester, 316 F.3d 291, 293 (2d Cir. 2003) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)); Kaltman-Glasel v. Dooley, 156 F. Supp. 2d 225, 226 (D.Conn. 2001).

When deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept the factual allegations in the complaint as true. See Desiano v. Warner-Lambert Co., 326 F.3d 339, 347 (2d Cir. 2003). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)). See also Gmurzynska v. Hutton, 355 F.3d 206, 210 (2d Cir. 2004) ("A complaint 'should not be dismissed for failure to state a claim unless it appears

12

beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'") (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). "Thus, the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Desiano, 326 F.3d at 347 (quotation marks and citation omitted).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference. Zito v. Leasecomm Corp., 02 Civ. 8074, 2004 U.S. Dist. LEXIS 19778, *16-17 (S.D.N.Y. Sept. 30, 2004) (citing Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993). While the court may not consider matters outside the pleadings, it may consider documents that are "integral" to the plaintiff's claims, even if not explicitly incorporated by reference (see Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)), and matters of which judicial notice may be taken. See Leonard F. v. Israel Discount Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999). A district court may "take judicial notice of documents filed in other courts . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991). Additionally, a court "may take judicial notice of admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action." Harris v. New York State Dept. of Health, 202 F. Supp. 2d 143, 173 n. 13 (S.D.N.Y. 2002).

**Discussion**

**I.     ABC Pacific's Motion to Dismiss Is Granted**

The Eleventh Count in the Amended Complaint alleges that ABC Pacific was unjustly

enriched when it purchased the Apollo Mall Plaza at the foreclosure auction because its title was not encumbered due to the payment – using Springhawk's money – of tax liens that were previously attached to the property.  Plaintiffs claim that ABC Pacific was enriched because it would have been required to pay the liens at the conclusion of the foreclosure process, before it could complete its purchase of the property.  Cplt. ¶¶ 173, 176.

Plaintiffs argue that the value of ABC Pacific's equitable interest in the property has been substantially increased as a result of Springhawk's elimination of the tax lien.  Cplt. ¶ 176.  Plaintiffs claim that ABC Pacific's receipt of this benefit, at Springhawk's expense, renders retention of the benefit unjust. Cplt. ¶ 177.  Thus, plaintiffs argue that, under equitable principles, ABC Pacific should be held accountable to Springhawk for the benefit it received, even in the absence of wrongdoing by ABC Pacific.  Plaintiffs claim that either Springhawk is entitled to the imposition of a resulting trust (in first lien position) against the Apollo Mall property to the extent of $300,000 or the value of any actual tax lien payments, or in the alternative, Carruthers and Springhawk are entitled to a money judgment against ABC Pacific in an amount not less than $300,000, plus interest.

Plaintiffs' claim is meritless.

The elements of unjust enrichment are that the defendant benefitted, at plaintiffs' expense, and that equity and good conscience require restitution.  Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000).  "To prevail on a claim of unjust enrichment, [a] plaintiff must show that (1) defendant was enriched (2) at plaintiff's expense, and (3) 'that it is against equity and good conscience to permit . . . defendant to retain what is sought to be recovered.'" Clark v. Darby, 300 A.D.2d 732, 732, 751 N.Y.S.2d 622 (2d Dep't 2002) (citations omitted).

Unjust enrichment sounds in quasi-contract.  See Lightfoot v. Union Carbide Corp., 110

F.3d 898, 905 (2d Cir.1997) ("[U]nder the quasi-contractual doctrine of unjust enrichment, courts may infer the existence of an implied contract to prevent one person from unjustly enriching himself at the other party's expense.") "This is significant, particularly with regard to the third element of the claim, as a plaintiff, 'in order to recover under a theory of quasi-contract, . . . must . . . prove that performance was rendered *for the defendant*, resulting in its unjust enrichment.'" Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 166 (S.D.N.Y. 1998) (quoting Metropolitan Electric Manufacturing Co. v. Herbert Construction Co., Inc., 183 A.D.2d 758, 759, 583 N.Y.S.2d 497, 498 (2d Dep't 1992) (emphasis added). Here that critical element is lacking.

In Kagan v. K-Tel Entertainment, Inc., 172 A.D2d 375, 568 N.Y.S.2d 756 (1st Dep't 1991), the First Department held:

> As reflected in the common law of the various states, to recover under a theory of quasi contract, a plaintiff must demonstrate that services were performed for the defendant resulting in its unjust enrichment. It is not enough that the defendant received a benefit from the activities of the plaintiff; if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery.

Id. at 376.

In this case, the performance at issue is Springhawk's advance of $550,000 as a purchase deposit on the Apollo Mall Plaza, some $300,000 of which was used to pay off tax liens against the property. These payments were not rendered for the benefit of ABC Pacific. On the contrary, Carruthers and Springhawk advanced these funds for their own benefit and perhaps the benefit of their business partners and the Unkechuag Indian Nation. Indeed, the Complaint alleges as much. See Cplt. ¶ 174. ("Carruthers and Springhawk believed that the payment would be applied to the tax liens, but that Springhawk would obtain the benefit of such payment by obtaining a release of

the tax lien when the property was transferred to the Unkechaug Indian Nation.").

ABC Pacific's motion to dismiss Count XI is granted, and it is dismissed as a defendant in this action.

## II.    The Simermeyer Defendants' Motion To Dismiss
##         Is Granted in Part and Denied in Part

### A.  Count III is Dismissed; Count IV is Dismissed in Part

Count III of the Amended Complaint alleges that, as a party to the operating agreements (which formed both Spinghawk and Summerhawk), Simermeyer took on specific contractual obligations, and was also subject to implied duties of honesty, care, loyalty, good faith, and fair dealing.  Cplt. ¶ 111.  Carruthers alleges that, as a member of Springhawk and Summerhawk, Simermeyer breached these obligations and duties – specifically his duties of care, loyalty, and the exercise of reasonable business discretion. Cplt. ¶¶ 112-14.  Similarly, Count IV, in part, alleges that Simermeyer breached fiduciary duties he owed to his partners as a member of Springhawk and Summerhawk. Cplt. ¶¶ 118, 119.

Based on my previous decision in this matter (see Carruthers I, *supra*, 365 F. Supp. 2d 448), it is law of the case that the operating agreement pursuant to which Springhawk was formed (see Cplt. ¶¶ 23, 25) cannot be enforced because its stated corporate purpose was illegal. Carruthers I, 365 F. Supp. 2d at 470.[7]  In Carruthers I, I held:

> Because the Unkechaug are not federally-recognized, they are

_____

[7] The initial pleadings specifically alleged that Springhawk was formed to develop and operate high-stakes bingo and other gaming facilities in Sullivan County, New York on ancestral land of the Unkechaug Indian Nation, and that its members entered into an operating agreement shortly after the LLC was formed for that purpose. Carruthers I, 365 F. Supp. 2d at 469-70 (citing the Complaint at ¶¶ 18, 21).

> neither sovereign nor can they claim preemption from state laws
> forbidding gambling that is extended to federally-recognized tribes
> by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§
> 2701, *et seq.* And lacking both sovereignty and the benefit of
> IGRA preemption, they are subject to New York's strict
> prohibition against gaming, just like anyone else."

Id. at 465-66.  I further held that, "Since Springhawk's stated corporate purpose was illegal, any agreement formed to operate Springhawk is unenforceable."  Id. at 470.

Because no such allegation of illicit purpose was asserted as to Summerhawk in the initial complaint, I did not make any findings in Carruthers I regarding the validity of the Summerhawk agreements.  See id. at 470.  However, the Complaint filed in the State Court Action states that both "Springhawk and Summerhawk are . . . companies established for the purpose of developing and operating high stakes Bingo, other gaming activities . . . in Sullivan County and Long Island, New York, on ancestral land of the Unkechaug Indian Nation." State Action Cplt. ¶ 13.[8]  It also states that, "Upon the formation of Springhawk and Summerhawk, the members entered into the operating agreement and became contractually bound to one another . . . . . " Id. at ¶ 16.

For the reasons I held that the Springhawk operating agreements were invalid in Carruthers I, I find that the Summerhawk operating agreements – which has the same illegal purpose – to be invalid as well.  See Carruthers I, 365 F. Supp. 2d at 465-70

Because the Springhawk and Summerhawk operating agreements are invalid, any claim to enforce the obligations created thereunder must be dismissed.  For that reason, I dismiss Count III in its entirety, and Count IV to the extent it alleges a breach based on Simermeyer's

---

[8] See, *supra,* note 5.

membership in the two LLC's, for failure to state a claim upon which relief can be granted.

**B. Counts I, II, and the Surviving Portion of Count IV**

The three Simermeyer defendants move to dismiss the remaining claims against them on several grounds: (1) all claims are barred by statute of limitations; (2) all claims are barred by the <u>Colorado River</u> abstention doctrine, because of a prior pending action in state court; (3) the claims against Wallace are barred by res judicata; (4) all claims against Simermeyer & Wallace must be dismissed because the firm was dissolved almost 15 years ago; (5) all claims against Wallace must be dismissed because the only allegation is vicarious liability based on membership in the dissolved firm; (6) all claims must be dismissed against the firm for failure to serve in timely and proper manner; and (7) the claims against Simermeyer fail to properly plead a claim for breach of fiduciary duty and/or duty of loyalty.

**1. The Claims are Not Barred by the Statute of Limitations**

The Simermeyer defendants argue that the claims asserted by plaintiffs under Counts I-IV must be dismissed as barred by the applicable three year statute of limitations because they were not interposed until more than three years after the complained of events occurred.

An action to recover for attorney malpractice (Count I) in New York is governed by a three-year statute of limitations, regardless of whether the underlying theory is based on contract or tort. <u>See</u> New York Civil Practice Law and Rules ("CPLR") § 214(6); <u>Hoffenberg v. Hoffman & Pollok</u>, 288 F. Supp. 2d 527, 536 (S.D.N.Y. 2003) (citing <u>De Carlo v. Ratner</u>, 204 F. Supp. 2d 630, 634 (S.D.N.Y. 2002); <u>Shumsky v. Eisenstein</u>, 96 N.Y.2d 164, 166 (2001)). Although fashioned in the complaint as three separate counts, all three remaining counts – attorney malpractice (Count I), impermissible conflicts of interest while serving as attorney for plaintiffs  (Count II), and breach of fiduciary duty as attorney for plaintiffs (Count IV) –  sound

in attorney malpractice, and are therefore all subject to the same three year statute of limitations.[9] Such claims accrue, and the limitations period starts running, when the malpractice is committed, not when the client discovers it. <u>Aaron v. Roemer, Wallens & Mineaux, LLP</u>, 272 A.D.2d 752, 754, 707 N.Y.S.2d 711 (3d Dep't 2000); <u>Hoffenberg</u>, 288 F. Supp. 2d at 536.

However, the Statute of Limitations can be tolled by the continuous representation rule, which tolls the running of the Statute of Limitations on a malpractice claim until the ongoing representation is completed. <u>See</u> <u>Glamm v. Allen</u>, 57 N.Y.2d 87, 93-94 (1982). To invoke this rule, "there must be 'clear indicia of an ongoing continuous, developing, and dependent relationship between the client and the attorney.'" <u>See</u> <u>Aaron</u>, *supra*, 272 A.D.2d at 754 (quoting <u>Luk Lamellen U. Kupplungbau GmbH v. Lerner</u>, 166 A.D.2d 505, 506, 560 N.Y.S.2d 787 (2d Dep't 1990)).

The rationale underlying the continuous representation rule is that "the client has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered . . . [n]either is a person expected to jeopardize his pending case or his relationship with the attorney handling that case during the period that the attorney continues to represent the person." <u>Aaron</u>, 272 A.D.2d at 754 (citations omitted). The rule also recognizes "that the professional 'not only is in a position to identify and correct his or her malpractice, but is best placed to do so.'" <u>Id.</u> (citations omitted).

---

[9] Furthermore, claims of breach of fiduciary duty (Count IV) are likewise governed by a three-year statute of limitations. <u>Hoffenberg</u>, 288 F. Supp. 2d at 536 (citing <u>Nobile v. Schwartz</u>, No. 99 Civ. 2375, 2000 WL 1753036, at *6 (S.D.N.Y. Nov.29, 2000); <u>Cooper v. Parsky</u>, 140 F.3d 433, 441 (2d Cir.1998) (stating claim for breach of fiduciary duty would be governed by a three year limitations period).

Therefore, the initial inquiries are: (1) when the malpractice was allegedly committed and (2) when Simermeyer's representation of Carruthers, Springhawk, and Summerhawk ceased.

The Amended Complaint alleges that Carruthers retained Simermeyer to represent him personally in late 2001, and also to form and represent Springhawk and Summerhawk, in January 2002. Cplt. ¶¶ 19, 22, 23, 25. Paragraph twenty-seven of the Amended Complaint states that Simermeyer served as attorney for Carruthers, Springhawk and Summerhawk "in connection with the matters alleged herein." Cplt. ¶ 27. And at paragraph sixty-six, the Amended Complaint states that, "*at all times relevant to this action*," Carruthers was under the belief that Simermeyer was serving as his personal attorney as well as attorney for Springhawk. Cplt. ¶ 66 (emphasis added).

The last specific reference to an action by Simermeyer in the Amended Complaint is, "Young received the $550,000 purchase deposit from defendant Simermeyer on behalf of Spinghawk during the first week of May 2002." Cplt. ¶ 162. Then, according to the Amended Complaint, "[o]n or about May 3, 2002," A.P. Equity used some of those funds to purchase the Apollo Mall Plaza from the Sullivan County IDA. Cplt. ¶ 61. The Amended Complaint alleges that, following the acquisition by A.P. Equity, title to the Apollo Mall was then transferred to the Unkechaug Indian Nation. Cplt. ¶ 63. It further alleges that, at the time title was transferred to the Unkechaugs, the mortgage encumbering the property was in the late stages of foreclosure. Id. The rest of the matters alleged in the Complaint necessarily occurred thereafter: e.g., the foreclosure action was ultimately concluded and the property was purchased by the mortgage holder – ABC Realty. Cplt. ¶ 64.

Per the allegations in the Amended Complaint, Simermeyer still represented Carruthers and Springhawk when the foreclosure action concluded and when the property was sold at

auction. Cplt. ¶ 66 ("At all times relevant to this action, Carruthers was under the reasonable belief that Simermeyer was serving as his personal attorney, as well as attorney for Springhawk."). Thus, from the plain language of the Complaint, it appears that Simermeyer's representation of plaintiffs continued for some time after the first week of May 2002.

I reject defendants' argument that the language of the Amended Complaint – specifically paragraph ninety-one – unambiguously states that any alleged malpractice by Carruthers against Simermeyer necessarily took place before April 30, 2002. Paragraph ninety-one reads, "From the formation of Springhawk and Summerhawk through the date of the purported closing of the Sullivan County land deal in April 2002, Simermeyer served as attorney to a variety of parties." Cplt. ¶ 91. Contrary to defendants' assertions, this paragraph does not state that Simermeyer's representation of Carruthers ceased in April of 2002. Rather it states that he represented a "*variety* of parties" through that date. See Cplt. ¶ 91 (emphasis added). This paragraph must be considered in context, and as part of plaintiffs' allegation that, while the Sullivan County land deal was being worked on, Simermeyer was secretly also representing other interests and parties. See Cplt. ¶ 68-70. Furthermore, this interpretation would directly contradict plaintiffs' allegation that, during the first week of May 2002, Simermeyer transferred the $550,000 purchase deposit to Young on behalf of Springhawk. See Cplt. ¶¶ 58, 162. Contrary to defendants' assertions, this paragraph does not negate the Amended Complaint's specific allegations and inferences that Simermeyer's representation of plaintiffs continued through the foreclosure proceedings and the auction of the Apollo Mall Plaza.

"Where a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." In re Integrated Resources Real Estate Ltd. Partnerships Securities

<u>Litigation</u>, 815 F. Supp. 620, 645 (S.D.N.Y. 1993) (citing <u>Schiavone v. Fortune</u>, 477 U.S. 21, 25-

32 106 S. Ct. 2379, 91 L. Ed. 2d 18 (1986); <u>Northwestern Nat. Ins. Inc. v. Alberts</u>, 769 F. Supp.

498, 510 (S.D.N.Y. 1991)). The motion to amend the complaint in this action was filed on May

6, 2005.  Therefore, plaintiffs' claims against the Simermeyer defendants would be barred by the

statute of limitations unless plaintiffs alleged that Simermeyer represented them beyond May 6,

2002.

     Accepting as true the factual allegations in the Amended Complaint, and drawing all

inferences in favor of the pleader, as I am required to do on a motion to dismiss (<u>see</u> <u>Giant</u>

<u>Group, Ltd. v. Sands</u>, 142 F. Supp. 2d 503, 505 (S.D.N.Y. 2001)), I find that the complaint

sufficiently alleges that the attorney-client relationship between Simermeyer and plaintiffs

extended for sometime beyond May 6, 2002.

     I deny this part of the motion without prejudice, because the evidence may show

plaintiffs' allegation of continuing representation to be wrong.

**2.  No "Exceptional" Circumstances  Exist to Warrant <u>Colorado River</u> Abstention**

     Defendants next argue that the claims against the Simermeyer defendants must be

dismissed under the <u>Colorado River</u> abstention doctrine, because there is another pending action

in the Supreme Court of the State of New York, Suffolk County ("the State Court Action")

"which was commenced by the very same plaintiffs as commenced in this action (prior to filing

this action), and which complaint contains identical causes of action against Simermeyer and

Wallace as are now alleged in the instant Amended Complaint." <u>See</u> Memorandum of Law of

Defendants Simermeyer, Wallace and Simermeyer & Wallace in Support of Their Motion to

Dismiss the Amended Complaint ("Def. Mem.") at 11.

     Abstention under <u>Colorado River</u> rests on "considerations of wise judicial

administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483. Colorado River abstention, however, is an "extraordinary and narrow exception to a federal court's duty to exercise its jurisdiction," and applies only "in exceptional circumstances where the order to the parties to repair to state court would clearly serve a countervailing interest." FDIC v. Four Star Holding Co., 178 F.3d 97, 101 (2d Cir. 1999); Mouchantaf v. International Modeling and Talent Ass'n, 368 F. Supp. 2d 303, 306 (S.D.N.Y. 2005).[10]

To determine whether abstention is appropriate, a federal court "must weigh six factors, with the balance heavily weighted in favor of the exercise of jurisdiction." Burnett v. Physician's Online, Inc., 99 F.3d 72, 76 (2d Cir. 1996) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 16, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)) (internal quotation marks omitted). The six factors are: "(1) assumption of jurisdiction over a res; (2) inconvenience of the forum; (3) avoidance of piecemeal litigation; (4) order in which the actions were filed; (5) the law that provides the rule of decision; and (6) protection of the federal plaintiff's rights." FDIC, 178 F.3d at 101; Burnett, 99 F.3d at 76. The decision to abstain does not depend "on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case." FDIC, 178 F.3d at 101.

---

[10] Because the policy underlying Colorado River abstention is judicial efficiency, this doctrine is substantially narrower than are the doctrines of Pullman, Younger and Burford abstention, which are based on "weightier" constitutional concerns. Colorado River, 424 U.S. at 817.

Before considering the factors set forth in <u>Colorado River</u>, a threshold determination is "whether the state and federal proceedings are indeed parallel, i.e., whether substantially the same parties are litigating the same issues in a state forum." <u>Mouchantaf</u>, 368 F. Supp. 2d at 306 (quoting <u>United Nat' Ins. Co. v. Waterfront N.Y. Realty, Corp.</u>, 948 F. Supp. 263, 271 (S.D.N.Y.1996)) (internal quotation marks omitted). The plaintiffs, Simermeyer, and Wallace are all parties to the State action and many of the causes of action are similar. While this action involves an additional party – the law firm, Simermeyer & Wallace – that fact does not automatically render the proceedings non-parallel. <u>See</u> <u>Great South Bay Medical Care, P.C. v. Allstate Ins. Co.</u>, 204 F. Supp. 2d 492, 496-7 (E.D.N.Y. 2002) ("Lawsuits are considered 'parallel' if 'substantially the same parties are contemporaneously litigating substantially the same issues in different forums.'") (quoting <u>Dittmer v. County of Suffolk</u>, 146 F.3d 113, 118 (2d Cir. 1998). Furthermore, the state action includes as defendants both of the alleged members of that partnership – Simermeyer and Wallace. Therefore, consideration of <u>Colorado River</u> abstention in this case is appropriate.

In examining the <u>Colorado River</u> factors, the task is not to find some substantial reason for the exercise of federal jurisdiction by the district court, but, rather to ascertain whether there exist "exceptional" circumstances with the "clearest of justifications" that can suffice under <u>Colorado River</u>. <u>See</u> <u>Moses H. Cone</u>, *supra*, 460 U.S. at 25-26. Here, I do not find such an exceptional circumstance.

*1. Is there a res over which the court has established jurisdiction?*

This action is an in personam action that does not involve a res. The absence of a res is a factor that weighs slightly in favor of retaining jurisdiction. <u>See</u> <u>Mouchantaf</u>, 368 F. Supp. 2d at 306 (citing <u>Woodford v. Community Action Agency of Greene County, Inc.</u>, 239 F.3d 517, 523

(2d Cir. 2001)).

*2. Is there any inconvenience of the federal forum?*

There is no appreciable difference in the level of inconvenience between the two fora. The Simermeyer defendants allegedly have a place of business in New York, New York. See Cplt. ¶ 16-18. From Manhattan, the federal courthouse in White Plains is no more inconvenient than the state court in Suffolk County – in fact, it is more convenient. Thus, this factor does not favor abstention. See, e.g., De Cisneros v. Younger, 871 F.2d 305, 307 (2d Cir. 1989); Bethlehem Contracting Co. v. Leher/McGovern, Inc., 800 F.2d 325, 327 (2d Cir. 1986).

3. *Will maintaining separate actions result in piecemeal litigation?*

Because the policies underlying Colorado River abstention are "considerations of '[w]ise judicial administration,' giving regard to conservation of judicial resources and comprehensive disposition of litigation" (Colorado River, *supra*, 424 U.S. at 817), the Supreme Court cases state that this is the predominant factor. See, e.g., Moses H. Cone, 460 U.S. at 16, 21.

Defendants raise the concern in their brief that "the identity of issues in the state and federal actions," and "the existence of concurrent proceedings" could "create[] the serious potential for spawning an unseemly and destructive race to see which forum can resolve which issue first." See Def. Mem. at 13 (citing Mouchantaf, *supra*, 368 F. Supp. 2d at 307). However, that is a dubious proposition.

For one thing, the claims asserted against Wallace in the two actions are not identical. Count V in the State action alleges that Wallace was responsible for the legal advice he personally gave to Simermeyer (as a member of Springhawk). State Action Cplt. ¶¶ 126-140. Unlike the federal action, the complaint in the State action did not allege vicarious liability for

Simermeyer's malpractice. In contrast, Counts I and II in the federal action allege vicarious liability against Wallace for legal malpractice by his law partner, Simermeyer. <u>See</u> Cplt. ¶¶ 102, 109. The federal action does not allege any liability for legal advice given by Wallace himself.

As against Simermeyer, the state court's jurisdiction over him personally is in dispute and the matter is on for a traverse hearing. It has yet to be resolved. If the state court lacks jurisdiction over Simermeyer, there is no chance of inconsistent litigation. And as to the law firm, Simermeyer & Wallace is not even a party to the state court action.

*4. Which case has priority?*

The State action was filed on August 12, 2003. Plaintiffs moved to amend the complaint in the federal case on May 6, 2005 (the original Complaint was filed on August 27, 2003). Based on chronology, the State action was filed almost twenty-one months before the plaintiffs moved to add the Simermeyer defendants to the federal action. However, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." <u>Cone Mem'l Hosp.</u>, 460 U.S. at 21; <u>see</u> <u>also</u> <u>De Cisneros</u>, 871 F.2d at 307.

Here, the state court action has been dismissed for lack of subject matter jurisdiction against Wallace, and no progress at all has been made on the substance of the claims against Simermeyer and the firm. As noted above, Simermeyer claims that Suffolk County lacks personal jurisdiction over him, and that controverted matter has not been resolved, and the firm is not a party to the state court proceeding.

*5. Does state or federal law control?*

The causes of action – attorney malpractice, breach of fiduciary duty – are governed by

state law.  However, the presence of state law issues will weigh in favor of abstention only in rare circumstances. Moses H. Cone, *supra*, 460 U.S. at 26. Because the state law issues are neither novel nor particularly complex, the absence of federal claims weighs only slightly in favor of abstention. See Mouchantaf, 368 F. Supp. 2d at 307-08 (citing De Cisneros v. Younger, 871 F.2d 305, 309 (2d Cir. 1989)); see also General Reins. Corp. v. Ciba-Geigy Corp., 853 F.2d 78, 82 (2d Cir. 1988).

*6. Is the state forum adequate to protect the federal plaintiffs' rights?*

There is no dispute that the state courts can ably protect the plaintiffs' procedural and substantive rights. Indeed, it was the plaintiffs who filed the state action in that forum almost twenty-one months before they amended the federal complaint to include the Simermeyer defendants.

*Conclusion*

From my analysis of these factors, I find the following:  Factors 1, 2, 3 and 4 all weigh against abstention.  Only Factors 5 and 6 weigh in favor of abstention, and neither presents "the clearest of justifications [that alone] will warrant" abstention. Colorado River, *supra*, 424 U.S. at 819.  Having examined the Colorado River factors, I find that there are no "exceptional" circumstances that warrant abstention under.

**3.     The Claims Against Wallace Are Not Barred By *Res Judicata***

Wallace moves to have the claims asserted against him dismissed on *res judicata* grounds.  A judgment entered by the State action by the Supreme Court of New York, Suffolk County on December 22, 2004, granted defendants' motion to dismiss the claims against the Unkechaug Indian Nation and Wallace, its Chief, because the court found that it lacked subject matter jurisdiction pursuant to the doctrine of sovereign immunity.  See Def. Mem., Exh. Q at 1-

2 ("[T]he complaint is dismissed, with prejudice, in its entirety as against defendants Unkechaug Indian Nation and Harry B. Wallace. . . . ").

The doctrine of res judicata precludes the relitigation of issues which were or could have been raised in a prior action in which there was a judgment on the merits.  Federated Department Stores, Inc. v. Moitie, 452 U.S.394, 394, 398, 101 S. Ct. 2424,  69 L. Ed 2d 103 (1981).

However, the doctrine of *res judicata* or issue preclusion in no way implicates jurisdiction. Thompson v. County of Franklin,  15 F.3d 245, 253 (2d Cir. 1994). Unlike dismissals for a plaintiff's failure to state a claim, dismissals for lack of subject matter jurisdiction are not on the merits and are not accorded *res judicata* effect. Id. (citing Exchange Nat'l Bank v. Touche Ross & Co., 544 F.2d 1126, 1130-31 (2d Cir.1976)).

The claims asserted against Wallace in the State action were not dismissed on the merits, and therefore, the judgment dismissing those claims does not preclude plaintiffs from raising claims against Wallace in this action.

**4.      All Claims Against Simermeyer & Wallace Are Dismissed
        And All Claims Against Wallace Are Dismissed**

The Simermeyer defendants next argue that Wallace and the law firm of Simermeyer & Wallace ("S&W" or "the firm") must be dismissed as defendants in this action because S&W ceased to exist long before any alleged legal representation of plaintiffs.  According to the Amended Complaint, Simermeyer first approached Carruthers and began representing him in "late 2001."  Cplt.  ¶¶ 19, 22.  The Simermeyer defendants claim that S&W was dissolved in 1991.  Significantly, they argue that, inasmuch as the firm did not exist by 2001, it could not have been involved with plaintiffs nor with Simermeyer's representation of plaintiffs.  Likewise, since the only allegations against Wallace are for vicarious liability based upon his alleged

association with Simermeyer, as a partner of S&W, if the firm had dissolved before 2001, the claim against Wallace has no basis either.

Whether or not the firm had dissolved before late 2001 – when Carruthers allegedly first met Simermeyer – is a question that can only decided on a motion for summary judgment. Although defendants moved to dismiss the claims against the law firm and Wallace under Rule 12(b)(6), they attached to the motion affidavits of Simermeyer and Wallace as well as numerous papers, exhibits, letters, and other documents. Plaintiff has responded to the motion with their own exhibits and documents, etc. I am, therefore, exercising my prerogative to convert defendants' motion to dismiss into a motion for summary judgment, and I will consider all of the material submitted by both sides in support of and in opposition to the motion. See, e.g., Garcha v. City of Beacon, 351 F. Supp. 2d 213, 215-16 (S.D.N.Y. 2005).

A district court has discretion to convert a motion to dismiss into a motion for summary judgment. See, e.g., In re G & A Books, Inc., 770 F.2d 288, 294-95 (2d Cir.1985); see also Green v. Doukas, 205 F.3d 1322 , 2000 WL 236471, at *2 (2d Cir. 2000). Generally, a court should give the parties explicit notice of its intention to convert such a motion; however, courts have recognized that, in certain circumstances, such explicit notice is not necessary. Green, 2000 WL 236471, at *2 (citing In re G & A Books, Inc., *supra*, 770 F.2d at 295).

The "essential inquiry," in exercising this discretion, is whether the parties "should reasonably have recognized the possibility that the motion might be converted to one for summary judgment or [whether they were] taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleading." In re G & A Books, Inc., 770 F.2d at 294-95; see also Metrokane, Inc. v. Wine Enthusiast, 185 F. Supp. 2d 321, 325 (S.D.N.Y. 2002). Where

both parties submit extrinsic evidence in support of their positions, a district court may fairly convert a motion to dismiss into one for summary judgment under Fed.R.Civ.P. 56. <u>Green</u>, 2000 WL 236741, at *2 (citing <u>In re G & A Books, Inc.</u>, *supra*, 770 F.2d at 295).

Since both parties submitted extrinsic evidence in support of their motions in this case, as noted above, I convert the instant motion into a motion for summary judgment under Rule 56. Rule 56(c) provides that summary judgment shall be granted where there is no "genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law," that is, where the party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to that party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Thus, a party opposing summary judgment must point to "specific facts showing that there is a genuine issue for trial," by proffering "significant probative evidence tending to support [its] complaint." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (citations omitted). The non-movant "may not rest upon the mere allegations or denials of [its] pleadings," Fed.R.Civ.P. 56(e), or upon "mere speculation or conjecture as to the true nature of the facts." <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1456 (2d Cir. 1995).

Having considered all the evidence submitted, I grant the motion and dismiss both Wallace and the law firm, S&W, from the case.

The Simermeyer defendants produced a preponderance of evidence that shows that S&W dissolved in 1991, some ten years before the Amended Complaint alleges that Simermeyer began representing Carruthers. Both the federal and New York state tax returns filed by S&W for the 1991 fiscal year indicate that they represent the firm's "Final Return." <u>See</u> Def. Mem., Exh. L

and T. Additionally, Simermeyer's 1993 individual tax return indicates that he is a sole practitioner (see Def. Mem., Exh. F), and Wallace's 1992 individual tax return states that he too is a sole practitioner. See Def. Mem., Exh. V. In signing these tax returns, both Simermeyer and Wallace declared, under the penalties of perjury, that the "returns and the accompanying schedules and statements . . . are true, correct, and complete." See Def. Mem. Exh. L, T, F, and V. The Simermeyer defendants also produced a letter from Wallace to the Internal Revenue Service, dated December 27, 1993, enclosing copies of certain personal tax returns that state that S&W was dissolved in 1991. See Def. Mem., Exh U. In their papers, plaintiffs do not challenge the authenticity of any of these documents or the accuracy of the information contained therein. See Plaintiffs' Memorandum of Law in Opposition to the Simermeyer Defendants' Motion to Dismiss at 17-20.

Plaintiffs however, argue that additional discovery is warranted based on their "investigation" – the fruits of which do nothing to cast doubt on the evidence proffered by the Simermeyer defendants. Specifically, plaintiffs produced as evidence: (1) a FindLaw.com listing that lists Simermeyer & Wallace with a New York, New York address (Affidavit of John G. Horn, Esq. ("Horn Aff.), Exh. A); (2) an August 27, 1998 decision of the New York State Tax Appeals Tribunal Listing which refers to challenged tax assessment against "the partnerships of Simermeyer and Wallace Esqs." (Horn Aff., Exh. B at 2); and (3) a copy of the listing from the New York Department of State Tax Warrant Notice System, indicating the existence of a tax warrant docketed on January 20, 1999 against the partnership of S&W (Horn Aff., Exh. C). Plaintiffs also point to the fact that The New York Secretary of State website does not have a Certificate of Dissolution or any other documentation on file that would confirm that S&W dissolved. See Horn Aff. ¶ 5.

There is no evidence explaining how the firm came to be listed on the FindLaw.com website, when that information was posted, how it was obtained, and whether it was periodically updated. For all I know, the person who started the website got hold of some old legal directory and simply input its contents without any verification. The website also lists Wallace as a solo practitioner at 207 Poopatuck Lane in Mastic, New York. <u>See</u> Reply Declaration of Robert J. Semaya, dated July 14, 2005 ("Semaya Dec."), Exh. B. I find this evidence both unreliable and irrelevant because it provides no information about how current the listings are nor does it identify the source of the information listed.

Second, plaintiffs produce a 1998 decision of the Tax Appeals Tribunal in which Simermeyer and his wife challenged certain tax assessments for the years ending December 31, 1989, 1990, 1991, and 1992. <u>See</u> Horn. Aff., Ex. B a 1. The decision states that the proceeding was discontinued with respect to the years 1989, 1990, and 1992. <u>See id.</u> at 3. Thus, the only issue is this proceeding was an assessment for the year 1991 – the last year, according to defendants' exhibits, that S&W was in existence. <u>See id.</u> The decision provides no evidence that the firm existed beyond the 1991 fiscal year.

Third, the tax warrant (Horn Aff., Exh C) provides no evidence regarding when the firm existed or dissolved (aside from the fact that it existed at sometime before January 20, 1999). The copy of the unofficial computer record produced by plaintiffs notes that this document was docketed on January 20, 1999. <u>See id.</u> It further states that because the warrant was filed prior to the implementation of the electronic filing system, that the date of filing must be derived from the paper filings. <u>See id.</u> Plaintiffs do not attach a copy of the paper filing which would indicate when this document was actually filed. Absent that date – which could be any date prior to

January 20, 1999 – this exhibit does nothing to contradict defendants' evidence of dissolution. In any event, there is no requirement that a partnership file a certificate of discontinuance. Section 130(10) of the New York General Business Law expressly states that such filing are permissive. See N.Y. Gen. Bus. Law § 130(10) (McKinney's 2004). Therefore, the failure by S&W to have filed such a certificate is proof of nothing.

Based on the evidence before me, I find that defendants have produced a preponderance of evidence – none of which has been contradicted by plaintiffs – which prove that the firm dissolved in 1991. That was some ten years before Simermeyer allegedly approached Carruthers and began representing him. Ergo, Simermeyer & Wallace cannot be held vicariously liable for any matters related to Simermeyer's alleged representation of plaintiffs, and it is dismissed as a defendant in this case.

Furthermore, because all of the claims against Wallace are also derivative claims – that is, no wrongdoing is alleged against Wallace – he could only be held liable vicariously as a partner of Simermeyer & Wallace. Therefore, the claims against Wallace are dismissed for the same reason.

**5. The Remaining Claim in Count IV is Properly Pled**

The Simermeyer defendants also argue that Count IV of the Amended Complaint fails to properly state a claim based on Simermeyer's breach of fiduciary duty. I have already dismissed Count IV to the extent that it relates to the fiduciary duty that arose because of Simermeyer's membership in Springhawk and Summerhawk. See *supra*, II.A.

The surviving claim in Count IV alleges that Simermeyer breached his fiduciary duty in his capacity as attorney for Carruthers, Springhawk, and Summerhawk. Cplt. ¶ 117. Plaintiffs

claim that this breach caused plaintiffs to incur not less than $1,500,000 in damages, including, but not limited to legal fees.  Cplt. ¶ 119.

Under New York law, to state a cognizable claim for fiduciary duty, a plaintiff must allege three elements: (1) the existence of a fiduciary relationship; (2) knowing breach of a duty that relationship imposes; and (3) damages suffered.  Scholastic Inc. v. Harris, 80 F. Supp. 2d 139, 152 (S.D.N.Y. 1999) (citing Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 281 (2d Cir. 1992).

The Amended Complaint alleges all three of these elements.  As to the first element, plaintiff satisfies the existence of a fiduciary relationship by alleging that Simermeyer served as attorney for Carruthers, Springhawk, and Summerhawk. Cplt. ¶¶ 27, 50.  Plaintiff alleges that Simermeyer breached his fiduciary duties as plaintiffs' attorney in multiple instances.  See, e.g., ¶¶ 66-71.  Plaintiffs also alleged significant financial damages as a result of the breach. Cplt. ¶ 119.  Thus, I find that plaintiffs have stated a cognizable claim against Simermeyer for breach of fiduciary duty.

## III.  The Simermeyer Defendants' Motion For Rule 11 Sanctions is Denied

At the conclusion of the Simermeyer defendants memorandum of law, they also ask this Court to impose Rule 11 Sanctions against the plaintiffs.  See Def. Mem. at 23-25. This request is denied.

Fed. R. Civ. P. 11(c)(1)(A) states that "[a] motion for sanctions under this rule shall be made separately from other motions.  The rule goes on to require that a motion for sanctions:

> shall not be filed with or presented to the court unless, within 21
> days after service of the motion (or such other period as the court
> may prescribe), the challenged paper, claim, defense, contingent,

allegation, or denial is not withdrawn or appropriately corrected.
Id.

"Court's have refused to award sanctions based on the failure to comply with these procedures." See, e.g., Lipiro v. Remee Prods., 75 F. Supp. 2d 174, 178 (S.D.N.Y. 1999) (citing cases).  And the Second Circuit has held that a District Court's award of sanctions in the face of such failure constitutes an abuse of discretion. Perpetual Secs., Inc. v. Tang, 290 F.3d 132 (2d Cir. 2002).  Because of the procedural defects in the Simermeyer defendants' motion for Rule 11 sanctions, I dismiss this motion without further consideration.

**Conclusion**

ABC Pacific's motion to dismiss Count XI of the Amended Complaint is granted.

The Simermeyer defendants' motion to dismiss Counts I-IV of the Amended Complaint is granted in part and denied in part.  The motion to dismiss is granted as to defendants Simermeyer & Wallace, and Wallace, individually. The motion to dismiss is granted as to Count III in its entirety, and to Count IV insofar as it alleges breach of fiduciary duties related to Simermeyer's membership in Springhawk and Summerhawk.

Counts I & 2 survive as against Simermeyer and Count IV survives to the extent it alleges breach of fiduciary duties related to Simermeyer's legal representation of plaintiffs.

The Simermeyer defendants' motion for Rule 11 sanctions is dismissed.

This constitutes the decision and order of the Court.


Date: September 21, 2005

## Conclusion

ABC Pacific's motion to dismiss Count XI of the Amended Complaint is granted.

The Simermeyer defendants' motion to dismiss Counts I-IV of the Amended Complaint is granted in part and denied in part. The motion to dismiss is granted as to defendants Simermeyer & Wallace, and Wallace, individually. The motion to dismiss is granted as to Count III in its entirety, and to Count IV insofar as it alleges breach of fiduciary duties related to Simermeyer's membership in Springhawk and Summerhawk.

Counts I & 2 survive as against Simermeyer and Count IV survives to the extent it alleges breach of fiduciary duties related to Simermeyer's legal representation of plaintiffs.

The Simermeyer defendants' motion for Rule 11 sanctions is dismissed.

This constitutes the decision and order of the Court.

Date: September 21, 2005

_____
U.S.D.J.

BY FAX TO ALL PARTIES